UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

     v.                                         1:12-cr-103
                                                (TJM)

KENNETH PETTWAY, JR.,

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

Before the Court is Defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. See dkt. # 1061.

## I.    BACKGROUND

The government charged Defendant Kenneth Pettway, Jr., in a Fourth Superseding Indictment on April 23, 2013. See dkt. # 139. The government alleged Defendant to have been a member of a criminal conspiracy to distribute drugs, to have possessed drugs, to have possessed guns in furtherance of a drug crime, and to have been a felon in possession of a weapon. After a trial, a jury convicted Defendant on five counts on May 31, 2018. See dkt. # 1026. Defendant then filed the instant motion for a new trial and the parties briefed the issues.

## II.    LEGAL STANDARD

Defendant moves for a new trial. Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendants' motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "A district court should

grant a new trial if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998) (quoting Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir. 1988)). The Court has some discretion in deciding a Rule 33 motion, and "is entitled 'to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005)(quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992). Still, "'the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.'" Id. (quoting United States v. Autuori, 212 F.3d 105, 120 (2d Cir. 2000). "Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." Sanchez, 969 F.2d at 1414. Even if the Court rejects testimony, however, the Defendant is not necessarily entitled to a new trial: "[t]he test is whether it would be manifest injustice to let the jury verdict stand." Id. Even if a court finds some testimony to be untruthful, a new trial should not be granted "unless the judge is prepared to answer 'no' to the following question: 'Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?'" Id. Such an evaluation requires the Court to examine "the totality of the case" and consider "[a]ll the facts and circumstances." Id.

### III.     ANALYSIS

Defendant raises two grounds in moving for a new trial, which the Court will address in turn.

**A.     Jury Pool**

Defendant first argues that he is entitled to a new trial because the jury selection process violated his Sixth Amendment rights. He contends that the jury did not represent a fair cross-section of the community. Defendant is an African American, but no potential jury was African American, despite the fact that 10% of the population in the counties from which the panel was drawn are African American. Defendant contends that this underrepresentation demonstrates a flaw in the District's jury selection process. The government responds that Defendant's motion is untimely as it was raised in writing only after the jury returned a verdict, and that the Court should therefore apply only a plain error standard. In any case, the government insists, the jury selection process did not violate Defendant's constitutional rights.

The Supreme Court has held "that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528 (1975). This requirement "applies only to the larger pool serving as the source of names and not to the petit jury." United States v. Jackman, 46 F.3d 1240, 1244 (2d Cir. 1995). A defendant has "the *opportunity* for a representative jury venire, not a representative venire itself." Id. (emphasis in original). "In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). To meet the third element, a defendant must show a "systematic" exclusion. United States v. Joyner, 201 F.3d 61, 75 (2d

Cir. 2000). At the same time, "[t]he defendant need not prove discriminatory intent on the part of those constructing or administering the jury selection process." Jackman, 46 F.3d at 1246.

The parties do not dispute that the Defendant is a member of a "distinctive group" in the community. See, e.g., Id. ("There is little question that both Blacks and Hispanics are 'distinctive' groups in the community for purposes of this test.") (quoting United States v. Biaggi, 680 F.Supp. 641, 648 (S.D.N.Y. 1988)).

Defendant argues that the makeup of the venire panel, which contained no African Americans, was not fair and reasonable given the demographics of the community. He points out that census data reveals that 1,529,576 people live in the seven New York counties from which the court drew the venire panel. Of that population, roughly ten percent (157,231) are African American. Defendant argues that the lack of representation on the panel "is *prima facie* evidence that a flaw exists in the selection process." Defendant further contends that this underrepresentation is a endemic in the Western District and constitutes a Sixth Amendment violation. He points out that another case in the Western District, tried last year, had a 56-person venire that included no minorities. The judge in that case struck the entire panel, and prosecutors allegedly remarked that the lack of Black jurors was an issue in at least four other cases. This persistent underrepresentation "defies statistical probabilities" and, he claims, "is exactly why the Court should grant" Defendant "a new trial forthwith."

The Western District of New York's website describes the District's process of selecting venire panels:

> Prior to the use of computers and automated processes, the selection of jurors for potential jury service within the U.S. District Court for the Western District of New York began with a procedure whereby names were manually selected from County

> Voter Registration and Department of Motor Vehicle lists randomly. Now, however, the selection of juror names is performed using computerized, automated procedures.
>
> Pursuant to 28 U.S.C. Section 1861, all litigants "have the right to grand and petit jurors selected at random from a fair cross section of the community." Effective with the 2008 Master Jury Wheel refill–jurors will be drawn from official voter registration listings as supplemented by New York State licensed drivers. These two source lists form the basis for the Court's "Master Jury Wheels." All potential juror names will be stored in an electronic format and will reside in an automated database. Based upon the needs of the Court, names of potential jurors will then be randomly drawn from the Court's Master Jury Wheels. Individuals selected will be mailed a one-step jury qualification questionnaire and summons. Individuals are required to complete and return the jury questionnaire in order to determine if the individual is legally qualified and available to serve as a juror. Once qualified, individuals are expected to report for jury service. All of the jury selection processes used by the U.S. District Court, Western District of New York uses a properly-programmed electronic data processing system based upon pure, randomized selection procedures. The pure randomized process ensures that the mathematical odds of any single source name being picked are substantially and mathematically equal.

http://www.nywd.uscourts.gov/public-notice-concerning-jury-selection-procedures. (visited October 5, 2018). The Court's website also explains that the western counties in the district serve the Buffalo office and the eastern counties serve the Rochester office.

http://www.nywd.uscourts.gov/jury-duty-information. (visited October 5, 2018).

Even conceding that Defendant can meet the first two elements of his *prima facie* case, Defendant's argument for the third element is unpersuasive. Defendant argues that:

> Mr. Pettway believes that his case is just one example of a systematic flaw in the juror selection process within the WDNY that, regrettably, excludes African-Americans from service. While the defense does not take the position that this flaw is the result of purposeful misconduct and concedes that the judiciary has taken steps to try to make the venire and jury pool more representative of the minority population within the WDNY, the fact is that this is not the first time in recent memory that such a "statistical anomaly" has occurred.

Defendant's Brief, dkt. # 1061-1, at 5 (emphasis added). Defendant also points out that other judges in the Western District, as well as prosecutors, have noted a problem with

finding African-American jurors.  The Court too recognizes this problem–one that also occurs in the Northern District of New York, where the undersigned Judge normally sits.  Still, Defendant concedes that the exclusion of Black jurors from the panels that he identifies is not the result of any misconduct or systematic attempt to exclude such jurors.  Defendant also admits that the Western District Court has taken steps to expand the jury pool and include minority members.  He complains that the results of such efforts have not yielded more representative jury pools and suggests that the exclusion of Black jurors cannot have been the result of mere chance.

On that basis, Defendant's motion must fail.  This case is like United States v. Bullock, 550 F.3d 247 (2d Cir. 2008).  In that case, Defendant complained after his conviction "that the jury venire in his case did not represent a fair cross-section of the community" and therefore violated the Sixth Amendment.  Id. at 251.  On appeal, Defendant presented evidence about the demographic makeup of the cities of Albany and Binghamton and of Broome County, all of which are in the Northern District of New York in an effort to show underrepresentation.  Id.  The Court of Appeals found that defendant, despite the apparent underrepresentation, "loses because he has not established any 'systematic exclusion.'" Id. (quoting Joyner, 201 F.3d at 75).  The trial judge had "explained at trial that in constructing the jury pool, the court drew potential jurors from the rolls of voters and drivers," and the court had included drivers in an attempt to be more "balanced."  Id.  The Court of Appeals found no evidence of a systematic attempt to exclude voters in these efforts: "[t]hat the district court failed in its attempt to achieve . . . balance does not detract from the court's demonstrably race-neutral approach to juror selection."  United States v. Bullock, 550 F.3d 247, 252 (2d Cir. 2008).  The Western District Court has made a similar effort here, even if it

failed to achieve its aims for representation that better reflects the demographics of the region. The Court includes both voters and drivers in its venire pools, which expands the panels to a broader demographic group, and has a systematic, random method for calling in jurors. As such, Defendant has not made out a *prima facie* case of a Sixth Amendment violation, and his motion will be denied in this respect.[1]

### B. Introduction of Rap Video

Defendant next argues that the Court improperly admitted into evidence a rap video that allegedly depicted him bragging about his involvement in crimes. Defendant argues that the government failed properly to authenticate the video. Witnesses testified that Defendant made reference to slang terms for manufacturing crack cocaine. The government made extensive use of the video in closing. Defendant contends that the government argued that the video represented an admission of guilt by the Defendant. The government responds that it presented ample evidence to authenticate the video.

Defendant argues that the government violated Federal Rule of Evidence 901 by failing properly to authenticate the video. Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authentication or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). "[E]vidence that satisfies the requirement" includes: (1) . . . [t]estimony that an item is what it is claimed to be" and "(4) . . . [testimony that] [t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the

---

[1]As the Court can resolve Defendant's Sixth Amendment claim by any standard of review, the Court declines to address the government's argument that Defendant's claim is untimely and thus subject to a less rigorous burdern.

item, taken together with all the circumstances." FED. R. EVID. 901(a)(1), (4). "A document may not be admitted into evidence unless it is shown to be genuine." United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir. 1990). "This evidence may be direct or circumstantial . . . and the latter category may include distinctive characteristics of the document itself[.]" Id. (internal citations omitted). "With respect to a document attributed to a defendant, the prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to him." Id. The requirement is satisfied 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'" United States v. Pluta, 176 F.3d 43, 49 (2d Cir. 1999) (quoting United States v. Ruggiero, 928 F.2d 1289, 1230 (2d Cir. 1991)). A proponent need not "'prove beyond a reasonable doubt that the evidence is what it purports to be.'" Id. (quoting United States v. Holmquist, 36 F.3d 154, 168 (1st Cir. 1994)). The requirement is that the proponent demonstrate a "'reasonable likelihood'" that the object is what it is claimed to be. Id. (quoting Holmquist, 36 F.3d at 168).

Defendant argues that the government failed to produce evidence sufficient to authenticate the rap video introduced at trial. That video, found on YouTube.com, purported to feature the image and voice of the Defendant. Defendant contends that Special Agent Donnelly, who provided the authentication for the video, lacked

> any particular knowledge regarding 1) Mr. Pettway (other than what Mr. Pettway looked like) or 2) who uploaded the rap video to YouTube.com (on this issue, Special Agent Donnelly offered no testimony).

Defendant's Brief, dkt. # 1061, at 9. The government responds that Donnelly's testimony was sufficient to authenticate the video. The government also points to the testimony of other witnesses who testified that the video contained images that connected the video to

- 8 -

Defendant, like the logo of his rap label, and connected him to the video by circumstantial evidence, such as the fact that Defendant produced rap videos and had a rap studio. A defense witness even testified that he recognized Defendant's voice on the video.

Defendant argues that Special Agent Donnelly, who introduced the video, failed to provide sufficient evidence to demonstrate the authenticity of the video:

> He viewed the webpage on the internet and testified that he recognized the defendant's likeness in the rap video based on his in-court observations of the defendant in the past. That is all. The government offered nothing to prove that Mr. Pettway created the YouTube video or posted it on YouTube.com. And, most importantly, the government did not offer any testimony (from Special Agent Donnelly or anyone else) that the voice in the rap video was that of Mr. Pettway. Given all the motives that several cooperating witnesses and others had to produce a fake video of Mr. Pettway, it was crucial for the government to make some effort to identify Mr. Pettway's voice as the voice singing inculpatory lyrics in the video. Here, the government made no such effort.

Defendant's Brief, at 11 (internal citation omitted). In reply to the government's response, Defendant emphasizes that no one authenticated his voice on the video and no one testified that Defendant had uploaded the YouTube video.

The Court will deny the motion in this respect as well. The Court notes that the Rule 901 question here is whether the government produced evidence sufficient to authenticate the video. That question is about the admissibility of the evidence, not the weight that jurors should have provided to the video. Indeed, "[t]he ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury." United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014). "[A]fter the proponent of the evidence has adduced sufficient evidence to support a finding that the proffered evidence is what it is claimed to be, the opposing party 'remains free to challenge the reliability of the evidence, minimize its importance, or to argue alternative interpretations of its meaning, but

these and similar other challenges go to the *weight* of the evidence—not its *admissibility*." Id. at 131 (quoting United States v. Tin Yat Chin, 371 F.3d 31, 35-38 (2d Cir. 2004) (emphasis in original)). The question on authentication is whether sufficient evidence existed to create a reasonable likelihood that the video was what the government claimed it to be: a video downloaded from YouTube that depicted the Defendant performing rap music.

Defendant relies heavily on the Second Circuit's opinion in United States v. Vayner to argue that the government failed to meet the standard required "to properly authenticate social media evidence found on the internet that the government would like to introduce at trial and ascribe to the defendant." Defendant's Reply Brief, dkt. # 1101, at 5. Defendant points out that the Second Circuit noted in Vayner that "'the mere fact that a page with [the defendant's] name and photograph . . . exist[s] on the Internet at the time of [the] Special Agent[']s testimony does not permit a reasonable conclusion that th[e] page was created by the defendant or on his behalf.'" Id. at 6 (quoting Vayner, 769 F.3d at 132). Defendant complains that none of the evidence cited by the government "lays a foundation to authenticate that Mr. Pettway uploaded this video to YouTube.com or established this page on YouTube.com." Id. Moreover, no one established that the voice on the video belonged to the Defendant, which Defendant contends "was a basic predicate to properly authenticating the video[.]" Id. at 7.

An examination of the Second Circuit's decision in Vayner undermines Defendant's arguments. In Vayner, the defendant faced "a single charge of a false identification document[.]" Vayner, 769 F.3d at 127. The primary witness for the government at trial was a cooperating witness who testified that he "was familiar with [defendant's] work as forger because he had previously paid [defendant] to create false diplomatic identification

documents in a scheme to avoid taxes on the purchase and resale" of automobiles. Id. The witness testified that defendant had agreed to forge a birth certificate for him. Id. The phony birth certificate would permit the witness to avoid military service in Ukraine. Id. Towards the end of the trial, the government attempted to introduce "a printout of a web page that the government claimed to be [defendant's] profile on VK.com," which a witness explained was "'the Russian equivalent of Facebook.'" Id. at 128. The trial court overruled defendant's objection that the page had not been properly authenticated. Id. The agent who authenticated the page "admitted that he had only a 'cursory familiarity' with VK, had never used the site except to view this single page, and did not know whether any identity verification was required in order for a user to create an account for the site." Id. at 128-29. In closing the government used the ZK site as "proof of the connection between [defendant] and the Gmail address," which defendant had used to send the false birth certificate." Id. at 129.

  The Court of Appeals found that the trial court admitted the evidence without proper authentication. Id. at 131. Noting that "Rule 901 requires 'evidence sufficient to support a finding that the item is what the proponent claims it to be[,]'" the court noted that "no evidence" existed to prove that defendant "himself had created the page or was responsible for its contents." Id. at 132. Without more, "the mere fact that a page with [defendant's] name and photograph happened to exist on the Internet at the time of" the witness' "testimony does not permit a reasonable conclusion that this page was created by the defendant or on his behalf." Id. "Evidence may be authenticated in many ways," the court noted, "and as with any piece of evidence whose authenticity is in question, the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context."

Id. at 133 (quoting United States v. Sliker, 751 F.2d 477, 488 (2d Cir. 1984)).  The purpose for introducing the web page in Vayner, however, required more for proper authentication: the government sought "to corroborate [the witness'] testimony that it was [defendant] who used the moniker 'azmadeuz' for the Gmail address from which the forged birth certificate was sent[.]"  Id.  "Rule 901 required that there be some basis beyond [the witness'] own testimony on which a reasonable juror could conclude that the page in question was not just any Internet page, but in fact [Defendant's] profile."  Id.  The evidence should have been excluded, the court found.  Id.

This case is different.  The government introduced a video obtained from YouTube that contained images of the Defendant rapping.  Unlike Vayner, the government did not introduce the evidence to show that the Defendant had placed the video on YouTube or to prove that a certain e-mail address belonged to him.  As Vayner explains, no hard and fast rule exists as to what type of information is necessary to authenticate an exhibit: authentication "depend[s] on context."  Id. at 133.  Here, the context is that the government sought to introduce a video of defendant in a rap video where he rapped about criminal activity similar to that with which he was charged; the witness explained the source of the video, how he discovered it, and identified Defendant as the person depicted in the video. Defendant does not dispute that the video came from YouTube, or that the video was present on that website.  He also does not dispute that he was the man in the video, or that the man in the video appeared to be rapping.  The witness's explanation about the source of the video was sufficient for a jury to be able to determine that the video was what the government said it was, given the circumstantial evidence in the case and the purpose for which the government introduced the evidence.  The government did not produce evidence

that would have demonstrated who uploaded the video to YouTube, but such evidence was not necessary for jurors to determine that the video was what the government claimed it to be. Who uploaded the video was immaterial to that question. Similarly, while a voice expert would have helped a jury determine whether Defendant was the person whose voice was heard on the video, that question was one about what weight to give the evidence, not whether the evidence was properly authenticated. Indeed, other witnesses testified on that issue. As such, jurors had sufficient information to determine that the evidence was what the government said it was, and the motion will be denied in this respect as well.

In any case, the Court finds that the evidence against the Defendant in this case–which included a number of witnesses who identified Defendant as involved in the drug conspiracy and drug crimes in question, as well as evidence that tied him to the gun crimes involved–was overwhelming. The Court cannot find that "it would be manifest injustice to let the jury verdict stand." Sanchez, 969 F.2d at 1414. Any error in admitting the video was harmless.

## IV.     CONCLUSION

For the reasons stated above, Defendant's motion for a new trial, dkt. # 1061, is hereby DENIED.

_Thomas J. McAvoy_
Thomas J. McAvoy
Senior, U.S. District Judge

**IT IS SO ORDERED.**

DATED: October 15, 2018