UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                    **DECISION AND ORDER**
                                                         12-CR-103S (1)

KENNETH PETTWAY, JR.,

                    Defendant.

## I. INTRODUCTION

Presently before this Court are Defendant Kenneth Pettway, Jr.'s second motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure and motion for release pending resentencing under 18 U.S.C. § 3143 (a)(2).   (Docket Nos. 1327, 1343.) The Honorable Thomas J. McAvoy, the trial judge, denied Pettway's first Rule 33 motion on October 15, 2018.[1]   See United States v. Pettway, No. 12-CR-103S (1), 2018 WL 4958962 (W.D.N.Y. Oct. 15, 2018).[2]   The government maintains that Pettway's current motion is procedurally barred and otherwise lacks merit, and it opposes Pettway's bid for release.   For the reasons discussed below, Pettway's motions are denied.

## II. BACKGROUND

### A. Procedural History

On May 22, 2018, Pettway proceeded to trial on a 5-count indictment[3] that

---

1 Judge McAvoy of the Northern District of New York presided over the trial of this matter as a visiting judge.   This district is indebted to Judge McAvoy for his generous service in this and other cases.

2 This decision is found in the record at Docket No. 1128.

3 Referring to the trial indictment.   See Docket No. 1033.

1

charged him with two counts of narcotics violations (Counts 1 and 3), possession of firearms and ammunition by a convicted felon (Count 5), and two counts of possession of firearms in furtherance of a drug-trafficking crime (Counts 2 and 4), in violation of 21 U.S.C. §§ 846, 841 (a)(1), (b)(1)A)(iii), (b)(1)(C) and 18 U.S.C. §§ 922 (g)(1), 924 (a)(2), (c)(1)(A)(i), (c)(1)(C)(i), 2.   (Docket Nos. 1014, 1033.)   Nine days later, the jury convicted Pettway on each count.   (Docket Nos. 1026, 1034, 1036.)

On July 7, 2018, after receiving several extensions of time, Pettway timely filed his first Rule 33 motion.   (Docket No. 1061.)   He argued that a new trial was required because the jury selection process violated his Sixth Amendment rights and because the court improperly admitted a rap video into evidence without proper authentication.   Judge McAvoy rejected both arguments and denied Pettway's motion on October 15, 2018, the same day he sentenced Pettway to an aggregate term of 480 months' imprisonment and five years' supervised release.   See Pettway, 2018 WL 4958962, at *1-6; Docket Nos. 1126, 1133.

Pettway appealed.   (Docket No. 1140.)

On February 26, 2021, the United States Court of Appeals for the Second Circuit affirmed the judgment in part, vacated it in part, and remanded for further proceedings. See United States v. Pettway, 845 F. App'x 42 (2d Cir. 2021).   The court vacated Pettway's felon-in-possession conviction under Rehaif v. United States, in which the United States Supreme Court held that to secure such a conviction, the government must prove that "the defendant knew he possessed a firearm and also that he knew he had the relevant status [e.g., that he was a felon] when he possessed it."   588 U.S. 225, 227, 139

S. Ct. 2191, 204 L. Ed. 2d 594 (2019).   Because Pettway's pre-Rehaif jury was not charged accordingly, and because the record did not contain sufficient evidence to show that Pettway was on notice of his status as a felon, the court determined on plain error review that Pettway's conviction on Count 5 must be vacated and the case remanded for *de novo* resentencing.   See Pettway, 845 F. App'x at 47.   The court further vacated the sentences on all counts to allow the district court to determine the applicability of the post-trial First Step Act amendments to 18 U.S.C. § 924 (c)(1)(C) that eliminated the "stacking" of multiple convictions from a single indictment for sentencing purposes.[4]   See id. at 47-48.   The court rejected Pettway's remaining arguments and affirmed the convictions as to all counts except Count 5.   See id. at 48-51.   The Mandate lodged on June 9, 2021. (Docket No. 1260.)

Shortly after the Second Circuit entered its Mandate, Judge McAvoy scheduled resentencing for September 3, 2021.   (Docket No. 1263.)   Resentencing was thereafter adjourned for consideration of the parties' submissions on how best to proceed to resentencing.   (Docket Nos. 1267, 1271, 1276.)   The Clerk of Court subsequently reassigned this matter to this Court on May 20, 2022.   (Docket No. 1295.)

On June 6, 2022, this Court directed the parties to update their submissions concerning the resentencing issues to be resolved.   (Docket No. 1296.)   The parties complied with that Order (Docket Nos. 1301, 1304), but it was thereafter determined that

---

4 As the court explained: "Prior to December of 2018, a defendant was subject to a twenty-five-year mandatory minimum for two § 924 (c) convictions even when they arose from the same indictment.   Deal v. United States, 508 U.S. 129, 132, 113 S. Ct. 1993, 124 L. Ed. 2d 44 (1993) (interpreting earlier version of § 924 (c)).   On December 21, 2018, Congress passed the First Step Act, which, *inter alia*, amended § 924 (c)(1)(C) to eliminate the stacking of multiple convictions arising from the same indictment."   Pettway, 845 F. App'x at 47-48.

Pettway's counsel had a non-waivable conflict of interest stemming from certain motions that Pettway intended to file in advance of resentencing (Docket No. 1308).

New counsel was ultimately assigned on December 21, 2022 (Docket No. 1309), and Pettway filed his instant motion on May 19, 2023 (Docket No. 1327), with briefing completed on September 28, 2023 (Docket Nos. 1332, 1336, 1337, 1341, 1342). Pettway also moved for release from custody pending resentencing.   (Docket No. 1343.) Briefing on that motion concluded on November 7, 2023 (Docket Nos. 1346, 1347), with this Court taking both motions under advisement without oral argument at that time.

**B.  Pettway's Motion for a New Trial**

Pettway principally maintains that a new trial is warranted due to prosecutorial misconduct.  He challenges the sufficiency of the evidence and contends that he is actually innocent of Count 1 (conspiring to possess with intent to distribute, and to distribute, 280 grams or more of crack cocaine) and Count 2 (possessing a firearm in furtherance of a drug-trafficking crime), and that his convictions were secured only because the government knowingly presented false and coerced testimony from witnesses in the grand jury and at trial.  He also maintains that his trial counsel was ineffective and that the government constructively amended the indictment at trial. Pettway's factual contentions follow.

**1.  Dalvin McCarriel**

Pettway first contends that former Assistant United States Attorney Anthony M. Bruce "threatened, coerced, and frightened" Dalvin McCarriel into testifying falsely against him before the grand jury and at trial.  <u>See</u> Affidavit of Kenneth Pettway, Jr.

("Pettway Aff."), Docket No. 1327-1, ¶¶ 4-6, 50.   According to Pettway, McCarriel told him personally and in a Facebook message in early 2017 (before Pettway's trial) that Bruce pressured him (McCarriel) into falsely incriminating Pettway in the grand jury.   Id. ¶ 27.   Pettway provided this information to his attorneys, but trial counsel allegedly did not fully investigate the issue before trial.   Id. ¶¶ 28-36.

At trial, McCarriel testified on cross-examination that Bruce "made" him testify before a grand jury about Pettway.   See Transcript, Docket No. 1179, pp. 21-24. McCarriel stated that Bruce acted like he would assist him with rape and domestic violence charges that he was facing in exchange for McCarriel "point[ing] the finger at" Pettway, but Bruce never assisted him.   Id. pp. 22-23.   McCarriel testified that he was "scared" when he testified before the grand jury, and that Bruce "had me so scared," but he did not elaborate on why he was scared.   Id. pp. 21, 23.   He further testified that he contacted Pettway on Facebook and told him that Bruce was trying to make him testify and that Bruce made him feel "trapped."   Id. pp. 23-24.   On re-direct examination, McCarriel testified that although he did not want to testify about Pettway before the grand jury, he testified truthfully and never lied.   Id. p. 29.

Tony Olivo, a private investigator, interviewed McCarriel at Pettway's request by telephone on August 12, 2022.   See Pettway Aff., ¶ 53, Exhibit A.   According to Olivo's report, McCarriel stated that "police and prosecutors"[5] pressured him to testify against Pettway and threatened him with rape and homicide charges if he failed to cooperate.

---

5 McCarriel told Olivo that he thought the prosecutor's name was "Flynn."   See Pettway Aff., Exhibit A, p. 1.

Id. ¶ 54, Exhibit A, p. 1.    McCarriel further advised that all of the information and testimony he previously provided about Pettway was false.    Id. ¶ 55, Exhibit A, p. 1.

### 2. Daryl Morrison

Pettway makes similar contentions as it relates to Daryl Morrison, another trial witness.    As with McCarriel, Pettway contends that Anthony Bruce "threatened, coerced, and frightened" Morrison into testifying falsely before the grand jury and at trial.    Id. ¶¶ 4-8.    He further alleges that Assistant United States Attorney Michael Felicetta, the trial prosecutor, called Morrison as a witness despite Morrison telling Felicetta that his previous testimony about Pettway was coerced by Bruce and false.    Id. ¶ 8.

At trial, Morrison testified on direct examination[6] that Bruce "persuaded" him to lie in his testimony before a grand jury and in the trial of Tre Smitherman, during which Morrison testified about his drug-trafficking activities with Pettway.[7]    See Transcript, Docket No. 1179, pp. 149-50.    Morrison stated that his previous testimony that Pettway was distributing crack cocaine to him was a lie.    Id. p. 150.    He further testified that he "never sold no drugs in my life," and he disclaimed his previous testimony to the contrary, including testimony that he engaged in drug-trafficking activities with Pettway.    Id. pp. 150-153, 157.

On cross-examination, Morrison testified that he was previously untruthful in his testimony because he was in jail on a gun conviction and wanted to go home.    Id. p. 154.    He therefore "told a lot of lies."    Id.    Morrison stated that he lied about "everything" in

---

6 Morrison testified as a hostile witness.    See Transcript, Docket No. 1179, pp. 140, 160.

7 See United States v. Tre Smitherman, 14-CR-155S (WDNY).

Pettway's case.   Id. p. 155.   Morrison further testified that he was "forced" and "threatened" to testify in the 2014 Smitherman trial.   Id. p. 157.

Olivo, the private investigator, also interviewed Morrison.   In an August 3, 2022, face-to-face interview, Morrison told Olivo that Anthony Bruce and two federal agents threatened to take his 90-year-old grandmother to jail and to destroy her house if he did not truthfully explain his relationship to Pettway.   See Pettway Aff., Exhibit B, p. 1.   He further advised that Bruce and the agents threatened him with homicide charges, told him what to say in a written statement, and coerced him into stating that Pettway ordered the shooting of an individual.   Id. pp. 1-2.   Morrison also told Olivo that Bruce and two federal agents repeatedly interrogated him without his attorney present and prepared a script for him to study and recite before a grand jury.   Id. p. 2.   Morrison further stated that the trial prosecutor—unidentified but described as "a red-faced man with glasses"— threatened him with perjury charges, warrants, and jail, if he did not repeat his false testimony at Pettway's trial.   Id.   This prosecutor also threatened to raid Morrison's loved ones' homes.   Id.   Morrison concluded by telling Olivo that he told the truth at Pettway's trial and said that "Anthony Bruce lied and made me lie."   Id.

### 3.  Kenneth James

Pettway maintains that the testimony of a third trial witness, Kenneth James, was also false.   James testified that he was a long-time crack cocaine dealer, beginning in 1995 when he was 15 years old.   See Transcript, Docket No. 1172, pp. 106-108, 110. He stated that he cooked powder cocaine into crack cocaine to sell on the streets, and that in 2011, he was getting cocaine from Pettway, whom he knew from the Bailey area

7

of Buffalo.   Id. pp. 108-110, 117, 118, 125-26, 156, 174.

James testified that he started buying drugs from Pettway two months after meeting him.   Id. pp. 119, 157-58.   James told Pettway that he was selling crack cocaine, at which point Pettway said that he sold "weight" or bulk quantities of crack cocaine.   Id. pp. 120-21.   James testified that his first purchase from Pettway was an "eight ball" or one-eighth of an ounce of crack cocaine.   Id. p. 121.   He thereafter began purchasing larger quantities from Pettway.   Id. p. 122.   James also purchased powder cocaine from Pettway a couple of times but was dissatisfied with the quality, so he thereafter limited his purchases from Pettway to only crack cocaine.   Id. p. 123.   James testified that he could not count the number of times he purchased crack cocaine from Pettway but it was "a lot of times" between 2006 and October 2011.   Id. pp. 123-24.   He further stated that he made ounce-quantity purchases of crack cocaine from Pettway up to 20 times.   Id. p. 124.

### 4.  Other Misconduct

In addition to the above, Pettway maintains that trial prosecutor Michael Felicetta twice elicited false testimony and mischaracterized evidence in direct contradiction of the parties' evidentiary stipulations.   See Pettway Aff., ¶¶ 67-73.   First, Felicetta questioned Daniel Granville, Chief of Narcotics, Erie County Sheriff's Office, about narcotics seized in the search of 23 Roosevelt Avenue on January 18, 2012.   Id. ¶¶ 67-70; Transcript, Docket No. 1172, p. 175.   Granville testified that crack cocaine was seized from the top of a kitchen cabinet at Roosevelt.   See Transcript, Docket No. 1173, pp. 11-12.   Pettway maintains that this testimony contradicts the parties' stipulation at Docket No. 1030-2,

which provides that a forensic examiner would testify that the substance seized was cocaine.   See Pettway Aff., ¶¶ 68-70.

Second, Felicetta questioned Warren Hawthorne, Captain, Erie County Sheriff's Office, about the substances involved in controlled buys Kenneth James made on December 12, 22, and 30, 2011.   See Pettway Aff., ¶¶ 74-75; Transcript, Docket No. 1172, pp. 53, 63.   It was intended that James attempt to purchase cocaine from Pettway. See Transcript, Docket No. 1172, pp. 63-64.   Hawthorne testified that James bought quantities of crack cocaine on each of the three occasions.   Id. p. 66.   Pettway maintains that this testimony contradicts the parties' stipulation at Docket No. 1030-1 concerning forensic testimony and lab reports that would provide that two of the three purchases involved powder cocaine, not crack cocaine.   See Pettway Aff., ¶ 76.

Finally, Pettway contends that Felicetta lied during his summation by stating that crack cocaine was discovered at 947 Glenwood Avenue, when the parties stipulated at Docket No. 1030-3 that a forensic examiner would testify that the substance was cocaine. Id. ¶¶ 72-73; Transcript, Docket No. 1175, p. 124.

### III. DISCUSSION

Pettway maintains that he is entitled to a new trial and should be released pending resentencing.   The government maintains that Pettway's Rule 33 motion is procedurally barred and otherwise without merit and that his confinement should continue.   The parties' arguments are addressed below.

### A.  Pettway's Rule 33 Motion for a New Trial

### 1.  Rule 33 Standard

Rule 33 of the Federal Rules of Criminal Procedure authorizes the court to "vacate any judgment and grant a new trial if the interest of justice so requires."   See Eberhart v. United States, 546 U.S. 12, 13, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005) (per curiam). While the rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice," this authority should be used "sparingly" and only in "the most extraordinary circumstances."   United States v. Sanchez, 969 F.2d 1409, 1413-14 (2d Cir. 1992).

To grant a Rule 33 motion, "[t]here must be a real concern that an innocent person may have been convicted," id. at 1414, since "the ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice," Ferguson, 246 F.3d 129, 134 (2d Cir. 2001).   See also United States v. Guang, 511 F.3d 110, 119 (2d Cir. 2007) ("For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted.") (internal quotation marks and citation omitted).

Courts faced with motions for a new trial must "examine the entire case, take into account all facts and circumstances, and make an objective evaluation."   Ferguson, 246 F.3d at 134.   In considering the evidence, a court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury."   Id. at 133 (internal quotation marks, brackets, and citation omitted).

Other than a motion grounded on newly discovered evidence, which is not at issue here,[8] a motion for new trial must be filed within 14 days after the verdict or finding of

---

8  Although the parties do not focus on it as such, McCarriel's recantation in 2022 could arguably be offered

guilty.   See Fed. R. Crim. P. 33 (b)(2).   But this period can be extended under Rule 45, even after the 14 days have run, upon a showing of excusable neglect.   See Fed. R. Crim. P. 45 (b)(1)(B); United States v. Owen, 559 F.3d 82, 83-84 (2d Cir. 2009); United States v. Robinson, 430 F.3d 537, 541 (2d Cir. 2005) ("The time limitations specified in Rule 33 are read in conjunction with Rule 45, which establishes how to compute and extend time."); United States v. Bishop, 12-CR-101A, 2020 WL 210107, at *2 (W.D.N.Y. Jan. 14, 2020).   This is because the 14-day deadline is not jurisdictional; it is an "inflexible claim-processing rule."   Eberhart, 546 U.S. at 13; Owen, 559 F.3d at 83-84.

"Excusable neglect is not easily demonstrated, nor was it intended to be."   See Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 534 (4th Cir. 1996).   Courts consider the following factors in determining excusable neglect: "(1) the danger of prejudice to the [non-movant]; (2) the length of the delay and its potential impact upon judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith." United States v. Scali, No. 16-CR-466 (NSR), 2018 WL 3536082, at *2 (S.D.N.Y. July 23, 2018) (alteration in original; citations and internal quotation marks omitted); see also United States v. Graham, No. 12-CR-311A, 2015 WL 1120255, at *3 (W.D.N.Y. Mar. 12, 2015).

These are essentially the Pioneer factors, of which, the reason for the delay is most

---

as newly discovered evidence.   Pettway's motion for a new trial based on this recantation, however, would still be untimely, as motions premised on newly discovered evidence must be filed within three years of the verdict.   See Fed. R. Crim. P. 33 (a).   And for the same reasons discussed in the context of the other grounds for a new trial, Pettway fails to show excusable neglect to excuse his untimely filing.

important.   See Pioneer Invs. Servs. Co. v. Brunswick Assocs. Ltd., 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993); Silivanch v. Celebrity Cruises, Inc., 333 F.3d 355, 366 (2d Cir. 2003) (noting that the analytical focus is on the third factor: reason for the delay); cf. United States v. Caraballo, No. 5:12-CR-105, 2014 WL 3535348, at *3 (D. Vt. July 16, 2014) (applying Pioneer factors to "excusable neglect" under Rule 45 (b)(1)(B)).   The decision "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."   Pioneer, 507 U.S. at 395.

**2.  Pettway has not established excusable neglect for his untimely motion.**

It is undisputed that Pettway filed his present motion outside of Rule 33's 14-day and 3-year windows.   The jury returned its verdict on May 31, 2018.   (Docket No. 1026.) Pettway filed the instant motion for new trial on May 19, 2023, nearly five years later. (Docket No. 1327.)   The question is therefore whether Pettway has demonstrated excusable neglect to extend the filing period to encompass his current motion.   He has not.

As it first relates to the danger of prejudice to the government, it cannot be overlooked that Pettway's motion comes some five years after his trial.   Such delay results in presumptive prejudice based on the likelihood that witnesses are unavailable or possess fading memories.   See United States v. Cook, No. 13-cr-777, 2014 WL 12681367, at *1 (S.D.N.Y. Nov. 17, 2014); United States v. Sabir, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007).   The government is also prejudiced by having its witnesses subjected to cross-examination at a new trial on events that occurred more than a decade ago involving 5-year-old trial testimony.   See United States v. Williams, 10-cr-622 (ADS),

2017 WL 5483744, at *3 (E.D.N.Y. Nov. 15, 2017).   So too, the government "has a significant interest in the finality of the verdict and in getting [Pettway] sentenced."   <u>Sabir</u>, 628 F. Supp. 2d at 417.   This factor therefore weighs against Pettway.

As to the length of the delay and its potential impact upon judicial proceedings, Pettway's motion is five years overdue and is predominantly premised on events that were known to him at trial, within the original 14-day period for Rule 33 motions, and after. Although five years is a significant delay, <u>see</u> <u>United States v. Knowles</u>, No. 18-CV-1950 (KMK), No. 11-CR630 (KMK), 2022 WL 999078, at *22 (S.D.N.Y. Mar. 30, 2022), the delay has not impeded judicial proceedings, other than to now delay resentencing to some degree.   This factor therefore weighs slightly against Pettway given the length of the delay.

As to the third, most important factor—the reason for the delay, including whether it was in Pettway's reasonable control—Pettway argues that he failed to present his claims earlier because of his trial attorney's ineffectiveness.   <u>See</u> Reply Affidavit of Kenneth Pettway, Jr. ("Pettway Reply Aff."), Docket No. 1336, ¶¶ 4, 22, 36. Ineffectiveness of counsel may support a finding of excusable neglect.   <u>See</u> <u>United States v. Brown</u>, 623 F.3d 104, 113 n. 5 (2d Cir. 2010).   This is especially true "where the allegedly ineffective attorney continued to represent Defendant during the 14 days following conviction or a finding of guilt and Defendant discovered the basis of the alleged ineffectiveness outside of the14-day period."   <u>Scali</u>, 2018 WL 3536082, at *3 (interpreting <u>Brown</u> <i>supra</i>).

Here, it is undisputed that trial counsel continued to represent Pettway during the

13

14-day period following his conviction.   Indeed, trial counsel filed a timely, albeit unsuccessful, Rule 33 motion.   But unlike in <u>Scali</u>, Pettway was aware of the basis of his ineffectiveness claims before, within, and after the 14-day period.   In his sworn pro se motion submitted as an exhibit, Pettway explains that he informed his former counsel in 2017 and trial counsel in 2018 about Anthony Bruce's alleged misconduct, but neither attorney investigated the allegations.   <u>See</u> Pro Se Motion, Docket No. 1336-2, pp. 3, 4, 5.   Pettway raised prosecutorial misconduct again with trial counsel in 2018 while discussing his appeal.   <u>See</u> <u>id.</u> p. 6.

Yet despite knowing that allegedly no investigation was performed, and despite knowing that prosecutorial misconduct was not raised in his initial Rule 33 motion or his appeal, Pettway nonetheless waited nearly five years to assert his ineffectiveness claims, and even then did so with hesitation.   <u>See</u> August 19, 2021 Email, Docket No. 1336-1, p. 1 (noting that Pettway was undecided about raising his ineffective-assistance-of-counsel claims because doing so would likely lead to trial counsel's removal).   Since the basis of Pettway's ineffectiveness claims have long been known to him, and since he does not establish that ineffective assistance of counsel prevented him from raising his instant claims earlier, this Court finds that this factor weighs against Pettway.

As to the final factor, there has been no showing that Pettway is bringing his present motion in bad faith.   This factor therefore weighs in his favor.   <u>See</u> <u>United States</u> <u>v. Estevez</u>, No. 3:14-cr-191-1 (MPS), 2016 WL 2349099, at *5 (D. Conn. May 4, 2016) (finding that absence of bad faith supports a finding of excusable neglect).

Overall, this Court finds that consideration of the <u>Pioneer</u> factors leads to the

conclusion that Pettway has failed to establish excusable neglect.   His Rule 33 motion is therefore untimely and thus procedurally barred.

### 3. The Mandate does not authorize Pettway's successive Rule 33 motion.

Pettway next argues that the Second Circuit's Mandate reopens his opportunity to file a successive motion for a new trial and to present issues not previously raised.   See Pettway Reply Aff., ¶ 31.   The government maintains that the Mandate cannot be read so expansively.

The "mandate rule" pertains to the district court's obligation to fulfill the appellate court's directives.   See United States v. Ben Zvi, 242 F.3d 89, 95 (2d Cir. 2001).   In short, the rule requires the district court to do what the appellate court says it must do. See Puricelli v. Arg., 797 F.3d 213, 218 (2d Cir. 2015); see also Callahan v. Cnty. of Suffolk, 96 F.4th 362, 367 (2d Cir. 2024).   The rule "'compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'"   Ben Zvi, 242 F.3d at 95 (quoting United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993)) (emphasis added by the Second Circuit).   Where the directives are specific, the district court must faithfully adhere to them.   See Puricelli, 797 F.3d at 218 ("where a mandate directs a district court to conduct specific proceedings and decide certain questions, generally the district court must conduct those proceedings and decide those questions").   Where the directives are more general, the district court has wider discretion to determine how to proceed.   See, e.g., Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 176 (2d Cir. 2014) (noting district court's wider discretion when directive generally requires "further proceedings").

"To determine whether an issue remains open for reconsideration on remand, the trial court should look to both the specific dictates of the remand order as well as the broader 'spirit of the mandate.'"    Ben Zvi, 242 F.3d at 95 (quoting United States v. Kikumura, 947 F.2d 72, 76 (3d Cir. 1991)).   "In the context of a remand for resentencing where an appellate court has already fully considered the merits of the conviction, the trial court generally is foreclosed from reconsidering the underlying merits of the conviction." Id. (citations omitted).

The Second Circuit's Mandate instructions here are read in the context of its overall opinion.   The court affirmed Pettway's convictions on all but Count 5.   See Pettway, 845 F. App'x at 46-47.   As to Count 5, the court vacated the conviction under Rehaif and "remand[ed] for the district court to consider the issue in light of the recent caselaw" and for de novo resentencing   Id. at 47, 48.   The referenced "issue" pertains to the proof required to secure a felon-in-possession conviction.   See id. at 46-47.   In light of that determination, the court also vacated the sentences on the rest of the counts for "the district court to decide, after consulting with the parties on remand, the applicability of the First Step Act to this case."   Id. at 48.   Consistent with these conclusions, the opinion's decretal paragraph reads as follows:

> For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** for further proceedings.   While we affirm the convictions as to all counts except Count 5, we **VACATE** the sentences on all counts.   As Count 5 remains unresolved, the district court shall conduct a de novo resentencing after resolving the open issues.

Id. at 51 (all emphasis in original).

Pettway first argues that the court's "remand for further proceedings"

16

encompasses his present motion for a new trial.   But the Second Circuit well described the "further proceedings" it contemplated.   Those proceedings consist of issues relating to the <u>Rehaif</u> vacatur of Count 5, the applicability of the First Step Act, and *de novo* resentencing.   These are the only "open issues" involved in the remand.[9]  <u>Id.</u> at 51. And even if the Second Circuit's remand language could be read more broadly, this Court would not exercise its discretion to include in the present proceedings Pettway's Rule 33 motion aimed at convictions that the Second Circuit affirmed.   <u>See</u> <u>Sompo Japan Ins. Co. of Am.</u>, 762 F.3d at 176 (providing that the course of proceedings on remand where the Mandate generally requires "further proceedings" falls within the district court's discretion).

Pettway next maintains that the Second Circuit's remand requiring *de novo* resentencing authorizes his untimely Rule 33 motion.   Citing <u>United States v. Quintieri</u>, Pettway argues that "[i]t is Pettway's position that the Second Circuit's remand for . . . '*de novo* resentencing' implicates an exception to the 'mandate rule' and permits Pettway to bring a Rule 33 motion that includes issues from his trial even if they were not raised prior to his initial sentencing."   <u>See</u> Defendant's Memorandum of Law, Docket No. 1337, p. 2; 306 F. 3d 1217 (2d Cir. 2002).   The government argues that <u>Quintieri</u> does not support Pettway's position.   This Court agrees.

<u>Quintieri</u> and its progeny concern the scope of resentencing proceedings when resentencing is ordered on remand, essentially whether those proceedings should be *de*

---

9 Pettway himself recognizes the limited nature of the open issues, defining them as "relating to Count 5." <u>See</u> Pettway Reply Aff., ¶ 5 ("On June 9, 2021, my case was remanded to the district court for 'further proceedings' and '*de novo* resentencing after resolving the open issues' (relating to Count 5).").

*novo* or limited in some fashion.   See Quintieri, 306 F.3d at 1221-22.   The scope of resentencing in Pettway's case, however, is not at issue: the Second Circuit unambiguously ordered *de novo* resentencing on all counts.   See Pettway, 845 F. App'x at 51.

Pettway instead relies on Quintieri for the proposition that "when a case is remanded for *de novo* resentencing, the defendant may raise in the district court and, if properly preserved there, on appeal to the court of appeals, issues that he or she had previously waived by failing to raise them."   Quintieri, 306 F.3d at 1225 (citation omitted). Pettway reads this statement as permitting any issue to be raised in a *de novo* resentencing proceeding, whether pertaining to resentencing or not, including revisitation of affirmed convictions via a motion for a new trial.   See Memorandum of Law, Docket No. 1342, pp. 4-5.

Quintieri cannot bear this interpretation.   Read in proper context, the Second Circuit's statement contemplates the raising of sentencing issues—not issues of any sort—in a remand for resentencing.   In United States v. Rigas, the Second Circuit described Quintieri as supplying two rules: "(1) where a count of a conviction is overturned—as opposed to an aspect of a sentence—resentencing must be *de novo*; and (2) *de novo* means 'anew,' . . . so that a defendant may raise issues even if they would otherwise have been waived."   583 F.3d 108, 116 (2d Cir. 2009) (internal citation omitted).   That the "issues" referenced refer to *sentencing* issues is recognized by United States v. Miller, where the court noted, "[a]s stated in Quintieri, however, when the resentencing is de novo rather than limited, *issues concerning the first sentence* that were

previously waived may be raised in the first instance if warranted by the second sentence." 594 F.3d 172, 179 (3d Cir. 2010) (emphasis added). Quintieri therefore does not save Pettway's untimely motion for new trial.

For these reasons, this Court finds that the Second Circuit's Mandate does not authorize Pettway's successive motion for a new trial, which remains procedurally barred.

### 4. Pettway fails to establish that a new trial is necessary to correct a manifest injustice.

Even if this Court were to find that Pettway's motion for a new trial is not procedurally barred, it would find that it fails on the merits. Pettway argues that he should be afforded a new trial for four reasons. First, he claims that the government engaged in prosecutorial misconduct. See Pettway Aff., ¶¶ 2 (b)-15; 50-76. Second, he maintains that there was insufficient evidence for the jury to convict him on Counts 1 and 2. See id. ¶¶ 2(a), 11, 12-15, 42-44, 47. Third, he asserts that trial counsel was ineffective. See id. ¶¶ 32-37. Fourth, he argues that the government constructively amended the indictment at trial. See id. ¶¶ 38-49. The government opposes Pettway's motion on all fronts. As set forth below, even if his motion was not barred as untimely, Pettway's contentions are unpersuasive.

### a. Pettway fails to establish that a new trial is necessary due to prosecutorial misconduct.

A defendant seeking a new trial due to prosecutorial misconduct bears a "heavy burden." United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993). "When a defendant alleges that prosecutorial misconduct entitles him to a new trial, he faces a substantial burden because the misconduct alleged must be so severe and significant as to result in

19

the denial of a fair trial." United States v. Muyet, 994 F. Supp. 501, 520 (S.D.N.Y. 1998) (citations omitted).  "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." United States v. Young, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985).  "To warrant reversal, the prosecutorial misconduct must cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002) (quotation marks and citations omitted).   In evaluating a prosecutorial-misconduct claim, a court considers the following factors: "(1) the severity of the alleged misconduct; (2) the curative measures taken; and (3) the likelihood of conviction absent any misconduct." Muyet, 994 F. Supp. at 520; see also Elias, 285 F.3d at 190.

### (1) The alleged coercion of McCarriel and Morrison.

Pettway first maintains that the government engaged in prosecutorial misconduct by coercing Dalvin McCarriel and Daryl Morrison into testifying and by coaching their testimony.   These accusations were known and raised at trial and explored during cross examination of both witnesses.

During his 2022 interview with private investigator Olivo, McCarriel claimed that law enforcement compelled him to testify by holding possible or pending charges over him, though McCarriel recalled interacting with the police and a prosecutor named "Flynn," not Anthony Bruce.  See Pettway Aff., Exhibit A, p. 1.   McCarriel also stated that when he testified before the grand jury, he lied and "said whet [sic] they (prosecutors) told him to say." Id.

20

These circumstances were known at trial and aired before the jury. McCarriel testified that he did not want to testify against Pettway, but prosecutor Anthony Bruce leveraged pending rape and domestic violence charges to compel him to testify. See Transcript, Docket No. 1179, pp. 21-29.

The same is true of Morrison. During his 2022 interview, Morrison reported that Bruce and law enforcement agents coerced him into writing a false statement about Pettway by threatening to jail his grandmother or destroy her house. See Pettway Aff., Exhibit B, p. 1. He also claimed that Bruce and federal agents gave him a "typed script" to read when he testified before the grand jury and that Michael Felicetta threatened him with perjury and other hardships if he did not repeat his false grand jury testimony. Id. p. 2. Nonetheless, Morrison told Olivo that his trial testimony was truthful. Id.

The jury heard Morrison's account of the pressure the government allegedly applied to secure his testimony. Morrison initially testified that he could not recall his testimony before the grand jury. See Transcript, Docket No. 1179, pp. 147-48. He then testified that Bruce "persuaded him to tell that," referring to his previous testimony before the grand jury and in the Smitherman trial. Id. pp. 148-50. He further stated that he lied in the Smitherman trial about his drug-trafficking activities with Pettway and that Bruce "persuaded me to say all that." Id. pp. 149-51. On cross-examination, Morrison testified that he "told a lot of lies" because he was facing a firearms charge and wanted to get out of jail. Id. pp. 153-54.

In evaluating this alleged misconduct, the court must consider its severity, the curative measures taken, and the likelihood that Pettway would have been convicted

21

without it.   Muyet, 994 F. Supp. at 520.   Assuming the truth of the allegations, this Court first finds that the conduct here is not sufficiently serious to warrant the extraordinary relief of a new trial.   The government leveraging charges to compel a witness to testify is not atypical, and use of that leverage was fully presented to the jury.   The government is not accused of interfering with Pettway's right to call witnesses or to confront those against him.   And while the alleged threatening of Morrison's grandmother was not specifically raised at trial, Morrison did not hold to his allegedly false testimony and instead told the jury that his grand jury and Smitherman testimony was false, that he testified there falsely because of Bruce, and that he lied to get out of jail.   In sum, the government's conduct, even if true, did not give rise to a perceived or actual miscarriage of justice.   See Sanchez, 969 F.2d at 1413-14.

Turning to curative measures, none were specifically taken at trial because Pettway did not object to the testimony as impermissibly coerced or coached. Nonetheless, Pettway had a full and fair opportunity to cross-examine both McCarriel and Morrison, and the jury had a full opportunity to assess their credibility and testimony.

Finally, Pettway makes no showing that he would have been acquitted absent the government's alleged misconduct.   Both McCarriel and Morrison exposed the government's alleged misconduct before the jury, and the jury was in the best position to fully evaluate the government's conduct and its affect, if any, on the testimony.   And again, Morrison specifically testified in Pettway's favor that all of his previous testimony was false, yet the jury convicted.   Thus, it cannot reasonably be concluded that Pettway would not have been convicted absent the alleged prosecutorial misconduct.

Accordingly, this Court finds that Pettway has failed to carry his heavy burden of demonstrating government misconduct so severe that it denied him a fair trial.  See Muyet, 994 F. Supp. at 520.  His motion for new trial on this basis will therefore be denied.

### (2) McCarriel's recantation.

Pettway next claims that prosecutor Anthony Bruce coerced and frightened McCarriel to testify falsely.  During his 2022 interview with private investigator Olivo, McCarriel recanted his previous grand jury and trial testimony and reported that he never bought drugs from Pettway.  See Pettway Aff., Exhibit A, p. 1.  He further stated that all of the information he provided about Pettway was untruthful.  Id.  This differs from his trial testimony, where McCarriel stated that his grand jury and trial testimony were truthful. Transcript, Docket No. 1179, p. 29.

Recantations are viewed with the utmost suspicion.  See Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003).  This is because recanted testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."  Dobbert v. Wainwright, 468 U.S. 1231, 1233-34, 105 S. Ct. 34, 82 L. Ed. 2d 925 (1984) (Brennan, J., dissenting); see also Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007) (citing Dobbert).

Motions for a new trial based on recanted trial testimony are viewed with skepticism.  See United States v. Lespier, No. CRIM. 398CR102AHN, 2006 WL 533792, at *5 (D. Conn. Mar. 1, 2006) (Report and Recommendation), affirmed, 266 F. App'x 5

23

(2d Cir. 2008).   Recanted testimony may serve as a basis for a new trial if the defendant establishes the following: "(1) that the testimony recanted was false and material; (2) that without the original testimony[,] the jury probably would have acquitted the defendant; and (3) that the party seeking the new trial was surprised when the false testimony was given or did not know of its falsity until after the trial, and could not with due diligence have discovered it earlier."   United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987) (internal citations omitted).

Pettway does not establish these factors.   While McCarriel's testimony about Pettway's drug-trafficking activities is presumably material, the only evidence suggesting that it was false is the report from McCarriel's interview with Olivo.   The interview largely tracks McCarriel's trial testimony concerning the government's alleged misconduct, but adds McCarriel's blanket claim that he lied before the grand jury and at trial.

But the veracity of this recantation is highly suspect as it appears plainly motivated by fear.   McCarriel told Olivo that he moved out of Buffalo because he fears for his life, that his friends and family call him a "snitch," and that he fears having to testify or go to court again.   See Pettway Aff., Exhibit A, p. 2.   Pettway also presents no sworn statement or affidavit directly from McCarriel; he relies solely on Olivo's hearsay account. See DiPaolo, 835 F.2d at 50 ("The failure of a defendant to produce or explain the absence of an affidavit of a recanting witness may be sufficient grounds for denying a motion for a new trial.").   McCarriel's reported recantation is therefore due reduced evidentiary weight and fails to establish that his previous testimony was false.[10]   See

---

10 Pettway does not request a hearing.   In any event, "[w]hen a motion for a new trial is predicated entirely

24

Lespier, 2006 WL 533792, at *6 (finding that failure to satisfy the first prong requires denial of a motion for new trial) (citing United States v. Kearney, 682 F.2d 214, 221 (D.C. Cir. 1982)); see also United States v. Pearson, 203 F.3d 1243, 1274-75 (10th Cir. 2000) (holding that an unsworn recantation is insufficient to warrant a new trial); United States v. Ward, 544 F.2d 975, 976 n. 2 (8th Cir. 1976) (per curiam) (same).

Pettway further makes an insufficient showing that he would have been acquitted but for McCarriel's allegedly false testimony.  McCarriel's testimony was not the only evidence of Pettway's drug-trafficking activities, nor was he the only witness to those activities.  Nothing in Pettway's motion establishes that he would have been acquitted if not for McCarriel's alleged untruthfulness.

Most notably, however, Pettway fails to establish that he was surprised by McCarriel's allegedly false testimony or unaware of its falsity until after the trial.  Indeed, Pettway admits that McCarriel told him before the trial started that he (McCarriel) was being pressured by the government to testify.  Moreover, Pettway's attorney specifically cross-examined McCarriel on whether he falsely "pointed the finger at" Pettway in exchange for assistance with his possible or pending charges.  See Transcript, Docket No. 1179, pp. 22-23.  All of this occurred before the jury, which was in the best position to assess McCarriel's credibility and weigh his testimony.  There is no indication that McCarriel's testimony was a surprise to Pettway, and if Pettway believed at trial that the testimony was false, he had every opportunity to object, cross-examine McCarriel, and

---

on an affidavit from a trial witness who recants her testimony, a trial judge can ordinarily deny it without a hearing."  DiPaolo, 835 F.2d at 51 (citations omitted).  Here, there is not even an affidavit, just a hearsay report.  This Court therefore finds no hearing necessary.

make his arguments to the jury.

Accordingly, with the relevant factors unsatisfied, this Court finds no basis to grant Pettway a new trial based on McCarriel's recantation or to conclude that Bruce coerced McCarriel into testifying falsely.   See Sanchez, 969 F.2d at 1414 ("[M]otions for a new trial based on the identification of perjured testimony should be granted only with great caution and in the most extraordinary circumstances.").

### (3) The government's alleged elicitation of false testimony.

Pettway next contends that the government engaged in prosecutorial misconduct by eliciting false testimony from Kenneth James and several law enforcement witnesses. See Pettway Aff., ¶¶ 9, 38, 67-76.

The presentation of false testimony alone is insufficient to order a new trial under Rule 33.   See United States v. White, 972 F.2d 16, 22 (2d Cir. 1992) ("the mere fact that [the witness] lied on the witness stand does not automatically entitle [the defendant] to a new trial").   Instead, the question is whether the false testimony affected the outcome of the trial.   See United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006).   If the government knew or should have known that false testimony was presented, a new trial is warranted if there exists a reasonable likelihood that the false testimony could have affected the judgment of the jury.   See United States v. Chinnici, 431 F. Supp. 3d 470, 487 (D. Vt. 2019) (quoting Fernandez v. Capra, 916 F.3d 215, 230 (2d Cir. 2019)).   If the government was unaware of the false testimony, a new trial is warranted only upon the demonstration of a firm belief that but for the false testimony, the defendant would most likely not have been convicted.   See Stewart, 433 F.3d at 297.

Pettway claims that James's testimony that he purchased controlled substances from Pettway multiple times over the course of five or six years was false.   See Transcript, Docket No. 1172, pp. 123-24.   But this contention is based solely on Pettway's self-serving denial of these facts.   See id. ¶ 40 (". . . I had not seen Kenneth James more than two or three times in the ten years before I saw him at 23 Roosevelt Avenue on December 30, 2011"), ¶ 41 (" . . . I certainly did not sell [Kenneth James] any drugs between 2005 and December 2011).   Pettway neither cites nor submits any contrary evidence that calls into question the veracity of James's testimony, which the jury presumably credited in finding Pettway guilty, despite arguments that it was "a myth." See Transcript, Docket No. 1175, p. 147.   And Pettway raised no objection to this testimony at trial.   Pettway thus fails to demonstrate that the government elicited false testimony from James.   This basis for a new trial is therefore denied.

Pettway next claims that the government elicited false testimony from law enforcement officers who stated that certain substances discovered in the search of 23 Roosevelt Avenue and purchased during controlled buys were crack cocaine.   According to Pettway, this testimony was false because stipulations reached between the parties provided that, if called to testify, a forensic laboratory witness would state that the substances were cocaine.   See Pettway Aff., ¶¶ 66-76.

For example, Daniel Granville from the Erie County Sheriff's Office testified that substances seized from 23 Roosevelt Avenue on January 18, 2012, included "crack cocaine."   See Transcript, Docket No. 1173, pp. 11-12 (discussing Government Exhibit 111).   A stipulation concerning forensic examiner Stephen J. Evers, however, provides

27

that he would have testified that forensic testing revealed that the substance was "cocaine."   See Docket No. 1030-2, ¶ 5.   Pettway also highlights a similar discrepancy in testimony elicited from Warren Hawthorne of the Erie County Sheriff's Office.   See Pettway Aff., ¶¶ 74-76.

Although Pettway correctly notes the discrepancy in the above testimony, he fails to show that the government elicited false testimony.   The law enforcement officers testified as to their understanding of the substances at issue, which conflicted with the stipulated testimony of the forensic examiner.   Conflicting testimony, however, does not amount to the elicitation of false testimony.   See United States v. Monteleone, 257 F.3d 210, 219-20 (2d Cir. 2001) ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.")   It is the jury's role to resolve discrepancies in testimony and evidence during the course of its deliberations.   See Hurdle v. Hoke, No. 86 CIV. 8749 (KMW), 1990 WL 52126, at *3 (S.D.N.Y. Apr. 17, 1990).   Pettway, who did not object to this testimony at trial, makes no showing that Felicetta intentionally elicited false testimony from any law enforcement witness, nor does he show that the discrepancy between crack cocaine and cocaine on these isolated occasions affected the outcome of the trial.   See Stewart, 433 F.3d at 297.   A new trial on this basis is therefore denied.

### (4) The government's alleged mischaracterization of evidence in summation.

Pettway argues that Michael Felicetta misstated Kenneth James's trial testimony and mischaracterized the physical evidence during his summation.   See Pettway Aff., ¶¶ 10, 38-49.   "[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a 'heavy burden.'"   United States v.

28

Farhane, 634 F.3d 127, 167 (2d Cir. 2011) (quoting United States v. Feliciano, 223 F.3d 102, 123 (2d Cir. 2000)).   "Flaws in the government's summation will require a new trial only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial."   United States v. Caracappa, 614 F.3d 30, 41 (2d Cir. 2010).   The defendant must show that "absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), [the defendant] would not have been convicted."   Elias, 285 F.3d at 192.

To begin, Pettway argues that Felicetta misstated James's testimony in his summation and misled the jury about the timeframe of James's interactions with Pettway. See Pettway Aff., ¶ 10.   Pettway cites only two alleged misstatements in support of his argument: Felicetta said "He can't even tell you how much he bought" and "He bought from him more times than he can recall over five or six years."   Id. ¶ 10 (referring to Transcript, Docket No. 1175, p. 110, 117).

Neither of these unobjected to statements misstated James's testimony or misled the jury.[11]   The relevant exchange between Felicetta and James at trial was as follows:

> Prosecutor:   And how many times do you think you would have had purchases from the defendant for crack cocaine?
>
> James:   Sometimes - - I can't count the amount of times. It was a lot of times.
>
> Prosecutor:   And the time period that we're talking about - -

---

11 In light of his failure to contemporaneously object to the government's summation, Pettway arguably waived any objection and failed to preserve the issue.   See United States v. McMahon, 21-CR-265 (PKC), 2024 WL 896838, at *21 (E.D.N.Y. Mar. 1, 2024); United States v. Frazier, No. 15-CR-153 (VSB), 2019 WL 761912, at *13 (S.D.N.Y. Feb. 21, 2019).   This Court nonetheless addresses the merits for the sake of completeness.

going back from when you got caught on Halloween of 2011, going back before that - - how long were you buying from him?

James:           I'd say about five to six years.   Probably five years.

Prosecutor:   Before you got caught?

James:           Before I got caught?

Prosecutor:   Yeah.

James:           Probably five years.

Prosecutor:   And you said more times than you could count?

James:           That's right.   Correct.

Prosecutor:   How many times did you buy an ounce of crack cocaine from the defendant?

James:           It was a lot of times.

Prosecutor:   Do you have any estimation, in your head at all? More than five?

James:           Yeah.

Prosecutor:   More than ten?

James:           Yeah.

Prosecutor:   More than 20?

James:           It was a lot of times.   I wouldn't - - it could have been - - nah.   I wouldn't say more than 20.

Prosecutor:   Somewhere between ten and 20?

James:           I would say over ten.   Yeah.   Yeah.   You're right.   So yeah.

See Transcript, Docket No. 1172, pp. 123-24.

Considering this testimony, this Court has little trouble concluding that Felicetta's statement that James "can't even tell you how much he bought" does not mischaracterize the testimony or mislead the jury.   James specifically testified that he could not count the number of times he purchased crack cocaine from Pettway nor the number of times that he purchased ounce quantities from him.   Id. pp. 123-24.   It was therefore a fair comment on and characterization of the testimony to say that James could not say how much product he bought from Pettway.

Similarly, Felicetta's statement that James "bought from [Pettway] more times than he can recall over five or six years" is firmly supported by James's testimony.   James testified that his purchases from Pettway were difficult to accurately count, and he specifically testified that he purchased crack cocaine from Pettway over the course of "about five or six years."   Id. p. 124.   Felicetta's near verbatim recitation of that testimony thus did not misrepresent or mischaracterize it.

Pettway next argues that Felicetta mischaracterized the physical evidence during his summation by blurring the distinction between crack cocaine and cocaine.   See Pettway Aff., ¶¶ 70-73.   Felicetta referred to "crack cocaine . . . found in the house" (referring to 23 Roosevelt Avenue) and "a half ounce of crack cocaine" found at 947 Glenwood Avenue.   See Transcript, Docket No. 1175, pp. 121-22, 124.

Pettway did not object to either of these statements at trial.   In any event, these two references, even if inconsistent with stipulated testimony, do not warrant a new trial, particularly since they are partially supported by witness testimony and are just two references in a lengthy closing argument.   See Transcript, Docket No. 1173, pp. 11-12

31

(Granville testifying that he found "crack cocaine" in a plastic bag on the top of a kitchen cabinet at 23 Roosevelt Avenue).   Viewed against the entire argument to the jury, it cannot fairly be concluded that these two references deprived Pettway of a fair trial or solely caused his convictions.   See Caracappa, 614 F.3d at 41; Elias, 285 F.3d at 192.

Accordingly, this Court finds that Pettway fails to establish any prosecutorial misconduct during the government's summation, and certainly none that denied him a fair trial or alone caused his convictions.   A new trial based on prosecutorial misconduct during summation is therefore denied.   See United States v. Casamento, 887 F.2d 1141, 1189 (2d Cir. 1989) ("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation.")

### b. Pettway's challenge to the sufficiency of the evidence on Counts 1 and 2 fails.

Pettway maintains that he is innocent of Counts 1 and 2, and that the evidence presented on each count was insufficient to convict him.    A motion for new trial based solely on the sufficiency of the evidence cannot be granted "unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."   United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (citing Sanchez, 969 F.2d at 1414).   "Under that standard, unless the evidence was patently incredible or defied physical realities, or unless an evidentiary or instructional error compromised the reliability of the verdict, a district court must defer to the jury's resolution of conflicting evidence."   United States v. Lettieri, 21-CR-20-LJV, 2023 WL 6531514, at *4 (W.D.N.Y. Oct. 6, 2023) (citations omitted).

Pettway's challenge to the sufficiency of the evidence is limited.   He argues that

the only evidence that ties him to the charged conspiracy is Kenneth James's allegedly false testimony.   See Pettway Aff., ¶¶ 11, 12.   He further argues that because James never testified to the specific dates of the alleged drug sales between them, there is no evidence that the sales occurred within the timeframe of the conspiracy charged in the indictment (2010-2011).   Id. ¶¶ 42-44.   Pettway thus complains that the jury was left to speculate that the sales occurred within the 2-year period of the charged conspiracy.   Id. ¶ 47.

Pettway's arguments fail for several reasons.   First, this Court has determined above that Pettway failed to demonstrate that Kenneth James's testimony was false. Second, James testified that he purchased crack cocaine repeatedly from Pettway, often in ounce quantities, during a time period that includes the charged conspiracy.   See Transcript, Docket No. 1172, pp. 123-24.   He also testified that he told officers when he was arrested in October 2011 with $35,000 in cash and multiple "bags of crack cocaine" that he was getting his cocaine from Pettway.   Id. p. 110-12, 117.   James further testified that he made multiple controlled purchases from Pettway and Pettway's associate within the charged conspiracy timeframe.   Id. ¶. 129-132; 133-138; 144-151.   And finally on redirect, James testified that Pettway was the person he had been purchasing crack cocaine from for five years.   Id. p. 174.

The jury considered this evidence along with the other unchallenged evidence of Pettway's involvement in the conspiracy and convicted on Counts 1 and 2.   Even in the absence of specific dates, James's testimony supports the reasonable inference and the jury's determination that Pettway engaged in the conspiracy as charged.   The jury was

not left to speculate.   Thus, Pettway fails to show that the evidence predominates against the jury's verdict so heavily that it would be manifestly unjust to let the verdict stand.   See Archer, 977 F.3d at 187.   A new trial based on insufficiency of the evidence is therefore denied.

### c. Pettway fails to establish that he received ineffective assistance of counsel.

Pettway next argues that a new trial is warranted because his trial counsel was ineffective.   In particular, Pettway argues that trial counsel (1) failed to investigate the government's alleged coercion of McCarriel and Morrison, despite Pettway providing him evidence of prosecutor Bruce's alleged misconduct, and (2) failed to challenge, object to, or otherwise address Kenneth James's testimony.   See Pettway Aff., ¶¶ 33-36; Pettway Reply Aff., ¶ 8; Reply Memorandum, Docket No. 1337, pp. 4-8.

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. CONST. amend VI.   It is well established that "the right to counsel is the right to the effective assistance of counsel."   Eze v. Senkowski, 321 F.3d 110, 124 (2d Cir. 2003) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)).

To secure a new trial on the ground of ineffective legal representation, Pettway must establish both prongs of the two-part test from Strickland v. Washington: (1) that his counsel's performance "fell below an objective standard of reasonableness;" and (2) that "the deficient performance prejudiced" him.   466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To satisfy the first prong of the <u>Strickland</u> test, Pettway must establish that his counsel's conduct fell below "an objective standard of reasonableness" under "prevailing professional norms" such that it was "outside the wide range of professionally competent assistance."   <u>Id.</u> at 688, 690.   Under this prong, the court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and be watchful 'to eliminate the distorting effects of hindsight.'"   <u>Aparicio v. Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001) (quoting <u>Strickland</u>, 466 U.S. at 689).   This is because "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way."   <u>Strickland</u>, 466 U.S. at 689 (internal citation omitted).   The question is ultimately "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom."   <u>Harrington v. Richter</u>, 562 U.S. 86, 105, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

To satisfy the second prong of the <u>Strickland</u> test, Pettway must establish that his attorney's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   <u>See</u> <u>Strickland</u>, 466 U.S. at 687, 694.   The Second Circuit normally "requires some objective evidence other than defendant's assertions to establish prejudice," <u>Pham v. United States</u>, 317 F.3d 182, 182 (2d Cir. 2003), because "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding," <u>Strickland</u>, 466 U.S. at 693.   Counsel's errors must have been

"so serious as to deprive the defendant of a fair trial."   Id. at 687.

Because both parts of the Strickland test must be satisfied to establish ineffective assistance of counsel, failure to satisfy one part of the test frees a district court from assessing whether the other part is satisfied.   Strickland, 466 U.S. at 697 (noting that a court need not "address both components of the [two-part Strickland] inquiry if the defendant makes an insufficient showing on one"); see also Stouse v. Leonardo, 928 F.2d 548, 556 (2d Cir. 1991).

Pettway first argues that trial counsel was ineffective because he failed to "fully" investigate the government's alleged coercion of McCarriel and Morrison.   See Pettway Aff., ¶¶ 33-36.   Pettway provided his counsel the evidence he had of the government's alleged misconduct, and trial counsel explored that misconduct at length on cross-examination with both McCarriel and Morrison.   Pettway attributes no fault to counsel's examination; he simply asserts that counsel should have investigated the allegations more fully.

Yet Pettway does not explain what a further investigation would have yielded. Indeed, the subsequent investigation by Olivo that Pettway presumably contends should have been done earlier did not meaningfully expand the alleged government misconduct known and revealed at trial.   McCarriel and Morrison simply reiterated their trial testimony that the government employed leveraging tactics to compel their testimony and coached their statements.   These are the exact points that trial counsel highlighted on cross-examination.   Pettway thus fails to establish that trial counsel's handling of the prosecutorial-misconduct allegations fell below "an objective standard of reasonableness"

36

under "prevailing professional norms" such that it was "outside the wide range of professionally competent assistance."   Id. Stickland, 466 U.S. at 688, 690.

Pettway similarly fails to demonstrate that trial counsel's handling of Kenneth James's testimony was objectively unreasonable.   Pettway maintains that trial counsel was ineffective because he did not "challenge, object to, or otherwise address" Kenneth James's testimony about the amount of drugs he purchased from Pettway or the specific dates on which he made such purchases.   See Pettway Reply Aff., ¶ 8; Reply Memorandum, Docket No. 1337, pp. 4-8.

It is well settled that "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance of counsel."   Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted); Eze, 321 F.3d at 136.   This includes a lawyer's decision whether to object to evidence.   Brown v. Artuz, 124 F.3d 73, 77 (2d Cir. 1997).   Thus, "'in case after case, [the Second Circuit has] declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised.'"   Loliscio v. Goord, 263 F.3d 178, 195 (2d Cir. 2001) (quoting Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996)).

Trial counsel's strategy as it pertained to Kenneth James was to paint him as a fabricator willing to testify falsely against Pettway to advance his own causes, most notably leniency on his own controlled-substances and firearms charges.   See Transcript, Docket No. 1172, pp. 47-48.   This strategy played out during cross-examination, when trial counsel highlighted that James was not charged for significant offenses he committed, see id. pp. 152-53, 155, and would fabricate testimony to protect

37

his family, see id. pp. 154-55.

Trial counsel further explored James' faulty memory, particularly about purchasing drugs from Pettway, and he attempted to show that James was lying by highlighting him looking out the window before answering questions and taking "four or five seconds to try to figure out whether the answer to that question [regarding purchasing cocaine from Pettway] was yes or no." Id. pp. 156-58. Trial counsel further questioned James's truth-telling by suggesting that he was simply agreeing with Felicetta's leading questions, rather than testifying on his own, and he tried to establish that James's testimony was invented because he really did not know, recognize, or remember Pettway. See id. pp. 159, 169-72.

Trial counsel then argued in his summation that James's testimony "pointing the finger at Kenneth Pettway" was uncorroborated, suspect, and motivated principally by James's desire to stay out of jail, and he characterized James as "[r]eport[ing] a myth, to try to keep [himself] out of jail." See Transcript, Docket No. 1175, pp. 146, 147, 161.

Pettway may in hindsight regret trial counsel's strategy as it pertained to Kenneth James, but it cannot be concluded that counsel's failure to object to portions of James's testimony constitutes ineffective assistance of counsel. Allowing James's lack of detail in his testimony about drug purchases from Pettway to stand fit trial counsel's narrative that James had a faulty, incomplete memory and made up his testimony out of whole cloth to further his own self-interest. Pettway therefore fails to demonstrate that trial counsel's performance in this regard was objectively unreasonable. See Henry, 409 F.3d at 63 ("[a]ctions or omissions by counsel that might be considered sound trial

strategy do not constitute ineffective assistance of counsel") (internal quotation marks and citations omitted); <u>Ventura v. United States</u>, 18-cv-9179 (JGK), 20-cv-8064 (JGK), 09-cr-1015 (JGK), 2024 WL 1929183, at *12 (S.D.N.Y. May 1, 2024) (noting that "decisions made by counsel about whether and when to object are a matter of strategy and tactics, and failure to object does not necessarily evidence deficient performance").

Although Pettway may wish that trial counsel investigated prosecutorial-misconduct allegations more fully and pressed harder against Kenneth James's testimony, he must demonstrate more than a disagreement with counsel's aggressiveness or strategy.  <u>See Harrington</u>, 562 U.S. at 105 (identifying the relevant inquiry as "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom").  He must show "that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687.  And he must do so in the face of the "strong presumption" that trial counsel's conduct fell "within the wide range of reasonable professional assistance."  <u>Id.</u> at 689.  Pettway fails in this pursuit, leaving the first <u>Strickland</u> prong unsatisfied, which alone defeats his claim.  <u>See Strickland</u>, 466 U.S. at 697 (holding that both <u>Strickland</u> prongs must be satisfied to establish ineffective assistance of counsel).

But even if Pettway had demonstrated representation that fell below an objective standard of reasonableness, he still fails to establish prejudice so severe that there exists a reasonable probability that he would have been acquitted but for his lawyer's errors. <u>See Strickland</u>, 466 U.S. at 687, 694.  As it relates to trial counsel's alleged failure to fully

39

investigate prosecutorial misconduct, Pettway establishes little prejudice since the facts learned in the post-trial investigation largely mirror those known and explored by counsel at trial.

As for counsel's failure to object to Kenneth James's testimony, Pettway's claim of prejudice is entirely speculative: he maintains that Judge McAvoy would have excluded the testimony under Rule 404 (b) of the Federal Rules of Evidence for lack of notice and as improper propensity evidence.   That is not necessarily the case.   Rule 404 (b)(2) permits the admission into evidence of other crimes, wrongs, or acts for a proper purpose, and Rule 404 (b)(3)(C) allows the court to excuse lack of pretrial notice.   Moreover, Judge McAvoy may have found that the evidence was not subject to Rule 404 (b) at all. See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404 (b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (internal quotation marks and citation omitted)); United States v. Escalera, 536 F. App'x 27, 32 (2d Cir. 2013) (summary order) ("Even if the [uncharged] sales were not inextricably intertwined, the district court would have had the discretion to admit them as background to the conspiracy, helping the jury understand how the illegal relationship among the participants developed, and how [the defendant's] role in the conspiracy evolved."). Pettway's claim of prejudice based solely on an evidentiary ruling that might have been is therefore entirely speculative.   Pettway thus fails to meet the second Strickland prong

as well.

In the end, Pettway fails to establish that a new trial is required due to ineffective assistance of counsel.

### d. Pettway fails to establish that the government constructively amended the indictment at trial.

Finally, Pettway maintains that the government constructively amended the indictment by eliciting testimony from Kenneth James concerning Pettway's drug-trafficking activity that occurred before the charged conspiracy.   See Pettway Aff., ¶¶ 39, 42-44, 47, 48.   Pettway argues that James's testimony impermissibly broadened the bases for conviction beyond the timeframe alleged in the indictment.

An indictment is constitutionally required to notify an individual of the elements of the charged offense, to inform of the charge against which the individual must defend, and to provide sufficient information to enable the individual to plead double jeopardy. See United States v. Resendiz-Ponce, 549 U.S. 102, 108, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007).   An indictment is constructively amended if evidence at trial or the jury charge broadens the possible bases for conviction from that contained in the indictment. See United States v. Rigas, 490 F.3d 208, 225 (2d Cir. 2007).

"To prevail on a constructive amendment claim, a defendant must demonstrate that 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'"   United States v. D'Amelio, 683 F.3d 412, 416 (2d Cir. 2012) (emphasis in original) (quoting United States v. Mollica, 849 F.2d 723, 729 (2d

Cir. 1988) (internal quotation marks omitted)).   The Second Circuit has, however, "consistently permitted significant flexibility in proof, provided that the defendant was given notice of the 'core of criminality' to be proven at trial."   United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983) (citing United States v. Sindona, 636 F.2d 792, 797-98 (2d Cir. 1980)).

Here, Pettway fails to establish that the evidence at trial broadened the possible bases for conviction such that there is a substantial likelihood that he may have been convicted of an offense other than the one charged in Count 1.   He does not claim any violation of his notice-based interests.   Instead, he claims only that the jury may have considered drug-trafficking activity occurring before the beginning of the charged conspiracy, based on James's testimony, when it convicted him on Count 1.

"The introduction of evidence of pre-conspiratorial events does not by itself create a constructive amendment to the indictment."   United States v. Cusimano, 148 F.3d 824, 829 (7th Cir. 1998).   In United States v. Spaeni, for example, the Seventh Circuit rejected the defendant's argument that "by presenting evidence of the conspiracy predating by almost two years the conspiracy charged in the indictment, the government impermissibly broadened the indictment and thus committed reversible error."   60 F.3d 313, 315 (7th Cir. 1995).   This is because "[t]here is no constructive amendment when a court 'admit[s] evidence of other criminal conduct that is inextricably intertwined with the charged offense or that completes the story of the charged offense.'"   McClurge v. United States, No. 04 C 3628, 2004 WL 2870072, at *3 (N.D. Ill. Dec. 13, 2004) (quoting United States v. King, 126 F.3d 987, 995 (7th Cir. 1997)).

As found above, the government introduced sufficient evidence of the conspiracy and of drug sales within the charged conspiracy to support the jury's finding of guilt on Count 1.   Moreover, James's testimony concerning his history of purchasing drugs from Pettway provided background on how the two men came to know each other and how their drug-trafficking relationship began and evolved.   It pertained to the story of the charged offense and was inextricably intertwined with evidence regarding the charged conspiracy.   Consequently, this Court finds that Pettway fails to establish constructive amendment of the indictment.   His motion for new trial on this basis is therefore denied.

## B.  Pettway's Motion for Release

Not long after his motion for a new trial was fully briefed, Pettway moved for release pending resentencing under 18 U.S.C. § 3143 (a)(2) on the basis that there existed a substantial likelihood that this Court would grant him a new trial.   See 18 U.S.C. § 3143 (a)(2)(A)(ii).   With that basis now mooted by this decision, Pettway's motion for release pending resentencing is denied.

## IV.   CONCLUSION

For the reasons stated above, Pettway's motions for a new trial and for release pending resentencing are denied.    Pettway's motion for a new trial is procedurally barred as untimely and, in any event, fails on the merits.   There is further no basis for release at this time.   The parties will be required to appear at a status conference before this Court to determine how best to proceed to resentencing.

## V.   ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for a New Trial (Docket No.

1327) is DENIED.

FURTHER, that Defendant's Motion for Release Pending Resentencing (Docket No. 1343) is DENIED.

FURTHER, that the parties must appear before this Court on June 27, 2024, at 10:30 a.m., for a status conference to determine how best to proceed to resentencing.

SO ORDERED.


Dated:   May 21, 2024
         Buffalo, New York

                                             s/William M. Skretny
                                           WILLIAM M. SKRETNY
                                          United States District Judge